Jason Matthew FOX, Plaintiff–
Appellant,

v.

Cris J. VAN OOSTERUM, Laude Hart-
rum, Larry Stewart, in his official ca-
pacity as Mason County Sherriff,
County of Mason, a municipal corpo-
ration, and John R. Bulger, Defen-
dants–Appellees.

No. 98–1022.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 29, 1999.

Decided May 10, 1999.

Douglas A. Springstead (argued), J. Nicholas Bostic (briefed), Springstead & Bostic, Hart, Michigan, for Plaintiff–Appellant.

Robert K. Kaufman, George W. Beeby (argued), Catherine D. Jasinski (briefed), Cummings, McClorey, Davis, Acho & Tremp, Traverse City, Michigan, for Defendants–Appellees.

Before: KENNEDY, DAUGHTREY, and CLAY, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. CLAY, J. (pp. 354–58), delivered a separate opinion concurring in part and dissenting in part.

KENNEDY, Circuit Judge.

Plaintiff Jason Matthew Fox appeals from the summary judgment dismissal in this 42 U.S.C. § 1983 ("section 1983") action against Mason County officials and Mason County. Fox alleges that defendants violated the Fourth, Sixth, and Fourteenth Amendments and state law by refusing to return his driver's license and by initiating a prosecution that resulted in a 60 day "discretionary time" sentence. With respect to Fox's driver's license claim against Mason County and Sheriff Stewart in his official capacity, we affirm the grant of summary judgment because Fox has not established any facts showing that the deprivations resulted from county custom or policy. With respect to Fox's driver's license claim against the individual defendants, we affirm the grant of summary judgment because Fox was not entitled to predeprivation process, Fox has not established any deficiency in postdeprivation remedies, and no seizure violating the Fourth Amendment occurred. With respect to the "discretionary time" claim, we affirm the grant of summary judgment

because the individual defendants possess absolute prosecutorial immunity against this claim. The "discretionary time" claim against Mason County fails because no evidence indicates that the deprivation resulted from county policy or custom.

## I. Factual Background and Procedural History

As this appeal reviews the grant of summary judgment for the defendants, we view the facts in the light most favorable to Fox. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In August 1993, defendant Laude Hartrum, a detective with the Mason County Sheriff's Department, began investigating several thefts from cars. Hartrum received a tip that Mike Thompson and plaintiff Fox were involved in the crimes. Hartrum arrested Thompson and impounded Thompson's truck. During an inventory search of the truck, Fox's wallet and driver's license were found. After additional evidence implicating Fox was collected, Fox was arrested and charged with two counts of Breaking and Entering a Motor Vehicle. Fox was released on the condition that he not drive. On August 26, 1993, defendant Hartrum observed Fox driving and arrested Fox. Fox's bond was revoked and he was incarcerated pending the outcome of the August 1993 car theft case.

Fox pleaded guilty to the August 1993 charges. The sentence, which Circuit Court Judge Richard Cooper imposed on November 2, 1993, contained some contradictory terms. Fox was sentenced to "serve 1 year in jail" with 71 days credit given for time previously served. However, the sentence also stated that he was to "[s]erve 6 mos. as follows: 90 days in jail

and 90 days on Community Corrections tether and/or community service. Remainder of jail time is reserved to be served at the Court's discretion." Fox signed an Order of Probation acknowledging the identical sentence.

Fox served the 90 days of his sentence minus the 71 days previously served and was released. Near the end of December, Fox paid several outstanding traffic tickets that had caused his license to be suspended. On January 5, 1994, Fox went to the Sheriff's office to collect his wallet and driver's license that were found during the inventory search of Thompson's truck in August 1993 and retained by the Sheriff's office since that time. Fox asked defendant Hartrum to return his wallet and its contents. After consulting with defendant Mason County Prosecuting Attorney Cris J. Van Oosterum, Hartrum returned Fox's wallet but refused to return the driver's license to Fox because, as he explained to Fox, Fox still had outstanding tickets. While Hartrum was correct that Fox had two outstanding civil infraction tickets for making excessive noise, those tickets had no impact on Fox's driving privileges, which had been restored in late December 1993 upon Fox's release from jail and payment of his outstanding traffic tickets. After January 5, 1994 and before January 26, 1994, Fox made one or two additional trips to the prosecutor's office to try to retrieve his driver's license. His trips were not successful. On January 26, 1994, Fox made another trip to the prosecutor's office, spoke with defendant Van Oosterum in person, and again demanded the return of his license. Van Oosterum gave Fox a copy of the license but refused to return the license until Fox paid his remaining tickets. On June 7, 1994, Fox ultimately received a duplicate license from the Secretary of State.[1]

---

1. The defendants have a different recollection of the events surrounding Fox's driver's license. They state that they did not return the license to Fox because he indicated that he was in the process of obtaining a duplicate license from the Secretary of State and that

Fox only asked for a copy of his license. We only consider Fox's version of the driver's license events and do not consider this version because we are reviewing a grant of summary judgment.

In the meantime, Fox was implicated in the theft of a truck. On February 21, 1994, an acquaintance of Fox reported to the police that Fox had stolen her father's truck. Within a few days, Fox was arrested and placed in jail. According to an affidavit submitted by Fox, Fox was informed that he had violated the conditions of his earlier probation and that he had been sentenced to 30 days of "discretionary time." According to Fox, before this incarceration, no hearing was held, no counsel for his defense was provided, and no notice of the charges was provided. Fox was released on March 22, 1994. In his first amended complaint, however, Fox does not allege that this period of discretionary time incarceration violated his constitutional rights or constituted a state law violation. Fox only complains of the next period of discretionary time incarceration starting in April 1994.

According to Fox's affidavit, on April 7, 1994, Fox was again arrested and arraigned on a warrant relating to the February 1994 theft of the truck incident. Fox posted bond and was released on April 12, 1994. Soon thereafter, Fox was informed that he had again violated the conditions of his release and that he had been sentenced to another period of discretionary time, this time for 60 days. Fox was not provided with notice of the charges against him, counsel for his defense, a hearing, or an opportunity to post bond or appeal. Fox was incarcerated until his release on May 31, 1994.

With respect to this April–May 1994 incarceration, the record also reveals that on April 12, 1994, defendant John R. Bulger, Mason County Assistant Prosecuting Attorney, filed a "Petition to Impose Discretionary Sentence" before Circuit Court Judge Richard Cooper. This petition asked the court to enter an "Order requiring Defendant, JASON FOX, to serve some or all of his remaining balance of his one (1) year jail sentence imposed by this Court on November 2, 1993." As grounds for this request, the petition cited the orig-

inal November 1993 sentence. That sentence had reserved jail time to the court's discretion and provided that "[a]s a condition of the discretionary jail time, the Defendant was not to violate the criminal laws of any subdivision." The petition also provided these additional grounds:

4. On March 9, 1994, the Mason County Sheriff Department forwarded a criminal complaint alleging that defendant has been involved in a criminal offense.

5. Upon thorough investigation, on March 25, 1994, the Mason County Prosecuting Attorney's Office issued a warrant for Jason Fox for Motor Vehicle, Unlawful Use and Contributing to the Delinquency of a Minor, (a copy of which is attached), respectfully, a felony and misdemeanor offense.

6. The police report further documents the defendant's engaging in antisocial conduct, associating with known supervised individuals, and committing other criminal offenses.

Circuit Court Judge Richard Cooper issued the requested order and then an amended order on the same day. The amended order sentenced Fox to serve "60 days discretionary time in the Mason County Jail" because Fox "failed to comply with the ... sentence order of the Court dated 2nd day of November 1993." On April 13, 1994, the day after Bulger filed the "Petition to Impose Discretionary Sentence" and it was granted, Bulger signed a "Motion/Order of Nolle Prosequi" with respect to the two counts—"Motor Vehicle, Unlawful Use" and "Contribute to Delinquency of a Minor"—arising from the February 1994 incident involving the truck. Both of these counts were cited in Bulger's petition requesting Judge Cooper to impose discretionary time. The "Motion/Order of Nolle Prosequi" cited as the reason for the motion that "[p]rosecution was unable to produce a key witness at preliminary examination." The "Motion/Order of Nolle Prosequi" was granted by a state district court judge on April 19, 1994.

In his affidavit, Fox described one more incarceration for discretionary time starting on August 4, 1994 and lasting 30 days. Fox's first amended and final complaint, however, does not allege that this period of discretionary time incarceration violated his constitutional rights or state law.

In March of 1995, a probation revocation hearing for Fox was held. Fox pleaded guilty to probation violations and was sentenced. Fox complains neither about the procedure used at this hearing nor the resulting sentence.

Fox filed the instant 42 U.S.C. § 1983 action in the district court. He alleged that the defendants violated (1) his Fourteenth Amendment right to due process, his Fourth Amendment right to be free from unreasonable seizures, and state tort laws prohibiting unlawful conversion and the intentional infliction of emotional distress by withholding his license starting on January 5, 1994 when he requested its return, and (2) his Sixth Amendment right to counsel, Fourteenth Amendment right to due process, and state abuse of process law in April–May 1994 when he was jailed for discretionary time without notice of the charges, counsel, or opportunities to be heard, post bond, or appeal his sentence. Defendants are Mason County and the following Mason County officials: Deputy Sheriff Laude Hartrum, Prosecuting Attorney Cris J. Van Oosterum, Assistant Prosecuting Attorney John C. Bulger, and Sheriff Larry Stewart in his official capacity as Mason County Sheriff. Fox names all the defendants except for Bulger in his driver's license claims; Fox names only defendants Bulger, Van Oosterum, and Mason County in the claims arising from the discretionary time incarceration.

The district court granted summary judgment to the defendants on Fox's federal constitutional claims and dismissed them with prejudice. The district court dismissed Fox's remaining state claims without prejudice.

## II. Discussion

We review a district court's grant of summary judgment de novo. *See Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We view the facts and all inferences drawn from the facts in the light most favorable to the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Below, we first discuss Fox's claims arising out of the defendants' retention of his driver's license. We then turn to Fox's discretionary time claims.

### A. Driver's License Claim

#### 1. Defendants Mason County and Sheriff Stewart in His Official Capacity

We first note that Fox's suit is against Sheriff Larry Stewart in his *official* capacity; Fox does not name Stewart in his individual capacity. Fox's suit against Sheriff Stewart in his official capacity is identical to his suit against the county. *See, e.g., Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."); *Monell v.*

*Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent...."). Below, our references to Fox's claims against the county also include Fox's claims against Stewart.

▇▇▇ To establish liability against the county, Fox must demonstrate that the deprivation resulted from a county policy or custom. *See Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *see also Board of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Monell* ). Counties, like municipalities, cannot be held liable under section 1983 on a respondeat superior theory. *See Brown,* 520 U.S. at 403, 117 S.Ct. 1382. The county must be the "moving force" behind the injury. *See id.* at 404, 117 S.Ct. 1382. The district court properly found that Fox has neither alleged nor presented any evidence that Hartrum and Van Oosterum acted pursuant to county policy or custom when they refused to return Fox's driver's license. No evidence indicates that this was anything more than a one-time, isolated event for which the county is not responsible. *Cf. Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018 (holding that absent a formal policy a section 1983 plaintiff must establish that the deprivation was caused by a "governmental custom").

▇▇▇ Fox also claims that Stewart failed to investigate the refusal to return the license after Fox's mother informed Stewart of Fox's license problems. The district court correctly concluded that this does not establish the required custom or policy because Fox has not presented evidence indicating that Stewart's decision was either part of a county policy or cus-

tom of refusing to investigate meritorious claims or anything other than an isolated, one-time event. The district court also properly rejected Fox's failure to train argument for the same reason—that Fox presented no evidence indicating that the county was put on notice of the likelihood of injury. *See Brown,* 520 U.S. at 407–09, 117 S.Ct. 1382.

### 2. *Defendants Hartrum and Van Oosterum*

▇▇▇ Fox claims that Hartrum and Van Oosterum violated the procedural due process component of the Fourteenth Amendment and the Fourth Amendment when they refused to return his driver's license to him.[2]

We conclude that the district court properly dismissed Fox's procedural due process claim because Fox was not entitled to predeprivation process and he has neither alleged nor presented any evidence that his postdeprivation remedies were inadequate. As to predeprivation process, in *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that predeprivation process is only required in cases where predeprivation process is feasible: "[t]he controlling inquiry [into whether predeprivation process must be provided] is solely whether the state is in a position to provide for predeprivation process." *Id.* at 534, 104 S.Ct. 3194; *see also Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Harris v. City of Akron,* 20 F.3d 1396, 1401 (6th Cir.1994) ("The touchstone of the *Parratt* rule is the impossibility or impracticability of providing predeprivation process combined with provisions for adequate postdeprivation

---

2. Fox primarily asserts that the defendants violated his property right to his driver's license. Fox does not make any argument from a liberty interest in the right to drive. Fox does argue that the defendants' refusal to return his license violated a liberty interest by

making it more difficult for him to find work because he lacked his driver's license to show as identification. We do not feel that analysis of this interest is materially different from an analysis of Fox's property right in his driver's license.

process."). Generally, predeprivation process consists of notice and a hearing. *See, e.g., Parratt,* 451 U.S. at 538, 101 S.Ct. 1908. Predeprivation process was not feasible here because, according to Fox, no deprivation occurred until after the defendants refused to return the license. The idea of providing predeprivation "notice" here is meaningless because no property deprivation is alleged to have occurred until Fox asked for the return of the license and that request was turned down. Furthermore, a predeprivation hearing is not feasible here. Would we require police officers and prosecutors to convene a hearing prior to answering all requests for the return of any evidence or property that the officers or prosecutors had collected during an investigation? We hold that Fox was not entitled to predeprivation process here because such process was not feasible.

 As to postdeprivation process, the district court correctly found that Fox's claim fails because he has not presented evidence that existing state remedies were inadequate. *See, e.g., Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995). State tort remedies generally satisfy the postdeprivation process requirement of the Due Process Clauses. *See, e.g., Hudson,* 468 U.S. at 534–36, 104 S.Ct. 3194. As the district court noted, two state remedies are readily apparent here— a state civil tort remedy for conversion and the Claim and Delivery procedure set out in Michigan Court Rule 3.105.

 We now turn to Fox's Fourth Amendment claim.[3] The district court

held that Hartrum and Van Oosterum possessed qualified immunity on this claim because in the Sixth Circuit it was not clearly established in early 1994 (when Hartrum and Van Oosterum refused to return the driver's license to Fox) that a claim such as this one could be brought both under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment. We need not reach that issue because we conclude that Hartrum and Van Oosterum did not violate Fox's Fourth Amendment rights. In doing so, we disagree with the district court's conclusion that the refusal to return the license gives rise to a claim for a seizure under the Fourth Amendment.

 Fox, in his affidavit submitted to the district court and in his briefs to the district court, has made it clear that he is not complaining about the initial seizure of his wallet, which occurred during the inventory search of Thompson's truck.[4] Rather, Fox contends that a "seizure" and resulting Fourth Amendment violation occurred when defendants Hartrum and Van Oosterum refused to return his license to him starting in January 1994. We hold that no seizure occurred when the defendants refused to return Fox's license, and therefore no Fourth Amendment violation.

 The Fourth Amendment prohibits unreasonable searches and seizures. Specifically, the Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

3. Of course, the Fourth Amendment does not apply directly to the actions of the defendants here, but rather it applies through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

4. For example, Fox's brief opposing summary judgment in the district court stated that "Plaintiff has never based his [42 U.S.C. § 1983] claim on the original, August 17, 1993, seizure of his license." At other times, Fox states that the inventory search was con-

ducted without a warrant, suggesting that Fox is challenging that search. We find that Fox has explicitly waived any challenge to the August 1993 search and ignore any indirect argumentation to the contrary. In any event, the fact that the inventory search was conducted without a warrant does not undermine the reasonableness of the search under the Fourth Amendment. *See, e.g., Colorado v. Bertine,* 479 U.S. 367, 371–72, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has established that one of the purposes of the prohibition on unreasonable seizures of property is the protection of the individual's property rights in the seized item. *See Soldal v. Cook County, Ill.,* 506 U.S. 56, 62–63, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (holding that the Fourth Amendment "protects property as well as privacy"). However, the courts have yet to define the breadth of the Fourth Amendment's protection of property. *Cf. United States v. Jacobsen,* 466 U.S. 109, 113 n. 5, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (noting that "the concept of a 'seizure' of property is not much discussed in [Supreme Court] cases"). Whatever the breadth of Fourth Amendment protection of property interests, that protection is limited to the breadth of the meaning of the word "seizure" in the Fourth Amendment.

 The Supreme Court has defined "seizure." For Fourth Amendment purposes a " 'seizure' of property ... occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Soldal v. Cook County, Ill.,* 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104

S.Ct. 1652, 80 L.Ed.2d 85 (1984) (Stevens, J.)); *cf. Texas v. Brown,* 460 U.S. 730, 747, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring in judgment) ("The [Fourth] Amendment protects two different interests of the citizen—the interest in *retaining* possession of property and the interest in maintaining personal privacy." (emphasis added)). Applying the *Soldal* seizure definition to the facts of this case, we find that no unreasonable seizure occurred when the defendants refused to return Fox's driver's license to him. Fox is challenging a refusal to return a piece of property that occurred over four months after the county actors came across the license, took possession of it, and stored it. *Soldal* and the other Supreme Court cases addressing seizures of property all concern state actors' role in taking possession of property. We hold that the seizure in this case, a seizure of property pursuant to an unchallenged inventory search that occurred over four months prior to the refusal to return the property, ended well before defendants Hartrum and Van Oosterum refused to return Fox's license. The refusal to return the license here neither brought about an additional seizure nor changed the character of the August 1993 seizure from a reasonable one to an unreasonable one because the seizure was already complete when the defendants refused to return the license.[5] If Fox was

---

5. The district court here and another district court in this circuit have held that the Fourth Amendment is violated when defendants improperly refuse to return property after a lawful initial seizure. *See Swales v. Township of Ravenna,* 989 F.Supp. 925, 940–41 (N.D.Ohio 1997) (holding that an initially reasonable seizure can become an unreasonable seizure that violates the Fourth Amendment when officers refuse to return seized property); *but see Palermo v. City of Chicago,* No. 91 C 4321, 1991 WL 268661, *3 (N.D.Ill.Dec.4, 1991) (rejecting such a Fourth Amendment claim), *aff'd without reaching this issue,* 980 F.2d 733, 1992 WL 348883 (7th Cir.1992) (unpublished order). In addition, the district court found that two unpublished opinions of this circuit suggest that claims similar to the one made by Fox here are cognizable under the Fourth Amendment. *See Bush v. Banks,* Nos.

95–6370, 96–5015, 1996 WL 668551 (6th Cir. 1996) (holding that allegations that a seized vehicle was improperly retained and damaged state claims of a denial of due process and right to be free from unreasonable seizure); *Eaton v. Farmer,* No. 93–6305, 1994 WL 151336 (6th Cir.1994) (holding that district court erred in dismissing as frivolous a complaint alleging "violations of due process, including an illegal seizure and retention of his property under the Fourth and Fourteenth Amendments and a procedural due process violation [and that] defendant officers refused to return his property without reason or explanation"). Neither unpublished opinion from our circuit separately analyzed the plaintiffs' due process claims and Fourth Amendment claims as *Soldal* instructs. *See* 506 U.S. at 70, 113 S.Ct. 538. In any event,

complaining about both an illegal initial seizure of the license and an illegal refusal to return it, he would have both a Fourth Amendment claim and at least the first step toward a procedural due process claim, which we discussed above. *See, e.g., Soldal,* 506 U.S. at 70, 113 S.Ct. 538; *Bonds v. Cox,* 20 F.3d 697, 702 (6th Cir. 1994).

■■■ The Supreme Court has only applied the "meaningful interference with possessory interests" definition of seizure to cases where there is no debate that the challenged act is one of taking property away from an individual and the issue is whether that act of taking property away constitutes a meaningful interference with possessory interests. The instant case presents an issue that precedes the work performed by the Supreme Court's *Soldal* definition of seizure—the issue of whether the government actor's action can be characterized as a seizure in the sense of taking away property from its owner. Put another way, the Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property. *Cf. Brown,* 460 U.S. at 747, 103 S.Ct. 1535 (Stevens, J., concurring in judgment) ("The [Fourth] Amendment protects two different interests of the citizen—the interest in *retaining* possession of property and the interest in maintaining personal privacy." (emphasis added)); Thomas K. Clancy, *What Does the Fourth Amendment Protect: Property, Privacy, or Security?,* 33 WAKE FOREST L. REV. 307, 356 (1998) (arguing that the Fourth Amendment's prohibition on unreasonable seizures as defined in *Soldal* protects "the individual['s] . . . right to remain in possession" of property); *see also Soldal,* 506 U.S. at 63, 113 S.Ct. 538 (citing J. Stevens's opinion in *Brown* as support for its definition of a seizure); *Jacobsen,* 466 U.S. at 109 & n. 5, 104 S.Ct. 1652 (same). Once that act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies.[6]

Our holding that no seizure occurred here is limited to the situation before us—an initial, lawful seizure of a piece of property followed by a refusal to return that property. We need not address either whether the term "seizure" in the Fourth Amendment has a different temporal scope when a person rather than property is at issue,[7] or whether a "seizure" occurs when a person voluntarily gives a thing to a state actor, then asks the state actor to return that thing, and the state actor refuses to do so.

the contrary authority is not controlling and we are not persuaded by its reasoning.

**6.** The dissent states that *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), "plainly demonstrates that Fourth Amendment jurisprudence already recognizes that a lawful seizure of property might, with the passage of time and the expiration or diminution of government interests, become unlawful." In *Place,* the Supreme Court held that law enforcement officers may briefly detain luggage on a reasonable suspicion that it contains narcotics. The *Place* Court provided a framework for analyzing when law enforcement agents may hold someone's property for a very short time on less than probable cause to pursue a limited course of investigation. The instant case involves an alleged "seizure" that occurred well after the point in time where *Place* is directly relevant. The plaintiff here is not challenging any action of the de-fendants until over four months after the plaintiff's license was removed from a vehicle pursuant to an inventory search, inventoried, and stored.

**7.** *See, e.g., Riley v. Dorton,* 115 F.3d 1159, 1162–64 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 631, 139 L.Ed.2d 611 (1997) (rejecting concept of "continuing seizure" and holding that Fourth Amendment does not apply after a person has been arrested but has not yet been tried; also collecting cases on "continuing seizure"); *Wilkins v. May,* 872 F.2d 190, 192 (7th Cir.1989) (same); *McDowell v. Rogers,* 863 F.2d 1302, 1306 (6th Cir.1988) (holding that Fourth Amendment seizure "continues throughout the time the person remains in the custody of the arresting officers"); *see also Albright v. Oliver,* 510 U.S. 266, 276–81, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) (endorsing concept of continuing seizure).

Our holding that no seizure occurred here is also motivated by the potential impacts of a contrary holding that the defendants seized the license when they refused to return it. Every "unreasonable" refusal to return property, and possibly also "unreasonable" failures to return property without even a request for its return, that followed a lawful initial seizure would constitute a Fourth Amendment violation. We are aware of the Supreme Court's admonition that each independent constitutional provision is to be analyzed individually, *see Soldal,* 506 U.S. at 70, 113 S.Ct. 538 (stating that "[w]here multiple violations are alleged .... we examine each constitutional provision in turn"), and we have followed that instruction here. However, we are reluctant to stretch temporally the Fourth Amendment to find a seizure here because doing so would replace for many cases the well-developed procedural due process analysis that provides the states with the first chance to prevent possible constitutional wrongs with a new, uncertain Fourth Amendment analysis that allows litigants to jump straight to federal court every time a state official refuses to return property that was, at least at one point, lawfully seized or lawfully in the state's possession.

Consider one possibility if we reached the opposite conclusion: claimants who request the return of property pursuant to Federal Rule of Criminal Procedure 41(e) or a similar state or local rule could instead claim its return and seek damages by way of section 1983 Fourth Amendment actions, even if the government had legally taken possession of the property. In these actions, courts would have to assess the reasonableness of refusals or failures to return property in order to determine whether a government official violated the Fourth Amendment. For example, courts would need to determine whether an official's refusal or failure to return property was reasonable where there is more than one claimant or the possibility of an additional claimant to the property.

For the reasons stated above, we conclude that defendants Hartrum and Van Oosterum did not violate the Fourth Amendment or the procedural due process component of the Fourteenth Amendment when they refused to return Fox's driver's license.

## B. "Discretionary Time" Claim

Fox's discretionary time claim is against defendants Bulger (Assistant Prosecuting Attorney for Mason County), Van Oosterum (the Prosecuting Attorney for Mason County), and Mason County itself. In his affidavit, Fox describes three periods of incarceration for discretionary time—30 days from the end of February 1994 to the end of March 1994, "60 days" from April 12, 1994 to approximately May 31, 1994, and an additional 30 days starting on approximately August 4, 1994. However, Fox's first amended and final complaint only alleges constitutional and state tort law violations from the 60 days of discretionary time starting in April 1994. The first amended complaint does not mention either the February–March 1994 or the August 1994 periods of discretionary time incarceration described by Fox in his affidavit. Therefore, Fox's claim only concerns the April–May 1994 discretionary time incarceration.

■ The district court relied on *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), to grant summary judgment to the defendants on the discretionary time claims. We do not reach the *Heck* issue in this case because we find that defendants Bulger and Van Oosterum are protected by absolute prosecutorial immunity and the claim against defendant Mason County fails for reasons described below.[8] Although the district court did not

---

**8.** We note that the various opinions in the recent *Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), indicate that five members of the Supreme Court may not apply *Heck* to a case where a plaintiff is no longer "in custody" and therefore not able

reach the issue of the defendant prosecutors' absolute immunity,. the issue was briefed before the district court and the plaintiff had the opportunity to argue against absolute immunity and did so. This court can affirm a grant of summary judgment on a ground presented to the district court if the opposing party has had a chance to respond. *See Herm v. Stafford,* 663 F.2d 669, 684 & n. 21 (6th Cir. 1981) ("An appellate court can find an alternative basis for concluding that a party is entitled to summary judgment ... provided it proceeds carefully so the opposing party is not denied an opportunity to respond to the new theory."). We have carefully reviewed the briefing presented to the district court on the absolute immunity issue as well as the rest of the record.

 "Prosecutors are entitled to absolute immunity for 'initiating a prosecution and ... presenting the state's case,'" *Lomaz v. Hennosy,* 151 F.3d 493, 499 (6th Cir.1998) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)), or, in other words, for conduct "intimately associated with the judicial phase of the criminal process," *Imbler,* 424 U.S. at 430, 96 S.Ct. 984. *See also, e.g., Kalina v. Fletcher,* 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). This absolute immunity covers "[a] prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer." *Ireland v. Tunis,* 113 F.3d 1435, 1446 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 560, 139 L.Ed.2d 401 (1997). In addition, "[a]bsolute prosecutorial immunity is not defeated by a showing that a prosecutor acted wrongfully or even maliciously. . . .

The decision to prosecute ... 'even if malicious and founded in bad faith, is unquestionably advocatory and at the heart of the holding in *Imbler.*'" *Grant v. Hollenbach,* 870 F.2d 1135, 1138 (6th Cir.1989) (citations omitted).

The only fact in the record implicating defendant Bulger is that Bulger filed a "Petition to Impose Discretionary Sentence," which Circuit Court Judge Cooper granted and which resulted in Fox's incarceration starting in April 1994. We find that Bulger's actions were the initiation of a prosecution and thus Bulger possesses absolute immunity against this claim. Van Oosterum is also shielded by absolute immunity because Fox has only alleged that Van Oosterum either directed Bulger to take this action or Van Oosterum acquiesced in Bulger's action. In either event, Van Oosterum's actions also were the initiation of a prosecution and therefore are protected by absolute immunity.

 Fox's claim concerning the discretionary time incarceration against Mason County fails because Fox has not established a Mason County policy or custom as required by *Monell. See* 436 U.S. at 690–91, 98 S.Ct. 2018; *see also Brown,* 520 U.S. at 403, 117 S.Ct. 1382. Fox's first amended complaint alleges that defendant Mason County authorized, tolerated, or acquiesced in "the creation of policies, practices and customs, establishing a defacto policy of deliberate indifference to individuals such as Plaintiff." However, Fox has not submitted evidence indicating that the Mason County prosecutors had a policy or custom of asking state judges to impose discretionary time sentences. In addition,

---

to attack his conviction via habeas corpus. *See, e.g., Nance v. Vieregge,* 147 F.3d 589, 591 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 426, 142 L.Ed.2d 347 (1998) (stating that five justices in *Spencer* concluded that "the approach of *Heck* does not govern when other relief is *impossible* "); *Johnson v. Freeburn,* 29 F.Supp.2d 764, 775 (E.D.Mich.1998) (relying on *Spencer* for the proposition that "it is now clear that five justices of the Supreme Court would limit *Heck* and its progeny to petition-

ers who attempt to bring a § 1983 action directly or indirectly challenging a conviction or disciplinary matter when such plaintiffs are 'in custody' and have an available federal remedy in habeas corpus"); *but cf. Schilling v. White,* 58 F.3d 1081, 1086 (6th Cir.1995) (stating, in a case decided after *Heck* but prior to *Spencer,* that *"Heck* applies as much to prisoners in custody (a habeas prerequisite) as to persons no longer incarcerated").

the actual imposition of the sentence in this case was done by a state rather than a county employee—the state circuit court judge. Therefore, Fox would not establish Mason County liability if he established, which he does not, that the state judge had a practice of imposing discretionary time sentences like the one imposed against Fox here. Although Fox states in his affidavit that he was sentenced three times to periods of discretionary time without process, he does not allege that any county officials, or anyone in particular, were responsible for these incarcerations.[9]

## III. Conclusion

For the foregoing reasons, we affirm the district court's dismissal of Fox's federal claims with prejudice and his state claims without prejudice.

CLAY, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority in its resolution of Fox's challenges to his sentence of "discretionary time," and its disposition of Fox's lawsuit as to Mason County and Sheriff Stewart in the retention by county employees of his driver's license. However, I disagree with the majority in its disposition in Part II.A.2 of Fox's action against Hartrum and Van Oosterum for their roles in the retention of his driver's license. Specifically, I believe there exists a genuine issue of fact as to whether the retention of Fox's driver's license by Hartrum and Van Oosterum constituted a "seizure" in violation of the Fourth Amendment. Accordingly, I respectfully dissent in part.

The Supreme Court has held that a "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). While a search implicates an individual's interest in maintaining personal privacy, a seizure threatens an individual's distinct interest in retaining possession of his property. *See Texas v. Brown*, 460 U.S. 730, 747–48, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring). In accordance with this understanding, the Court has rejected the argument that the Fourth Amendment only nominally applies when a seizure "stands apart from a search or any other investigative activity." *Soldal v. Cook County*, 506 U.S. 56, 68, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). Rather, a seizure of property is subject to Fourth Amendment scrutiny even where no search has taken place. *See id.* Even where one no longer holds a privacy interest in seized property, he may hold a possessory interest that continues to survive long after the seizure takes place. *See United States v. Paige*, 136 F.3d 1012, 1021–22 (5th Cir.1998).

A simple application of these principles directs that whenever the government meaningfully interferes with an individual's interest in property, a "seizure" subject to the reasonableness analysis of the Fourth Amendment takes place. However, in disposing of Fox's claim against Hartrum and Van Oosterum, the majority asserts that the refusal to return Fox's license could not amount to an unreasonable "seizure" because the seizure in this case began and ended in August 1993. Under the majority view, a seizure of per-

9. At oral argument, counsel for the plaintiff stated that this type of sentencing is common in Mason County. Of course, we can only look to the record that was before the district court and cannot rely on this statement. Because Fox's discretionary time claims against Bulger and Van Oosterum are barred by prosecutorial immunity and his claim against the county fails for lack of evidence on the record suggesting the existence of a county custom or policy, we do not reach the issue of whether the sentence and sentencing here to discretionary time without process violates due process and other constitutional safeguards. If Fox had appealed from his sentences or the orders of incarceration, this issue could have been squarely presented to the Michigan Court of Appeals, the Michigan Supreme Court, and ultimately to the United States Supreme Court.

sonal property that begins as legal could never become unlawful or unreasonable, because the seizure itself has ended long before the issue of unlawful retention arises. While the majority dismisses a series of cases holding the contrary,[1] it offers not a single case in support of the narrow view that a seizure begins and ends at the moment it takes place. Moreover, in rejecting the concept of a "continuing seizure," the majority seeks to distinguish cases where one voluntarily turns property over to the government but does not receive it back, and to distinguish the issue of "whether the term 'seizure' has a different temporal scope when a person rather than property is at issue." Because "[a]n individual's Fourth Amendment right to be free from unreasonable seizures cannot be eviscerated by the fact that the detention of his property began as a legitimate seizure," *United States v. Carter*, 139 F.3d 424, 435 (4th Cir.1998) (en banc) (Erwin, J., dissenting),[2] I cannot agree with the majority's view.

The concept that a seizure of property may, just as seizures of individuals, begin as reasonable but may then ripen into a seizure that violates the Fourth Amendment is not new to constitutional jurisprudence. *See United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Avery*, 137 F.3d 343, 349 (6th Cir.1997). This is so even though the plain meaning of the term "seizure" is "[t]he act of taking possession of

property." Black's Law Dictionary 1359 (6th ed.1990). Indeed, in *Place*, the Supreme Court recognized that the Fourth Amendment principles that apply to seizures of persons also govern seizures of personal effects. *See Place*, 462 U.S. at 703, 103 S.Ct. 2637. Accordingly, when faced with a seizure of property, courts must:

> balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure on less than probable cause.

*Id.* The Court concluded in *Place* that certain "brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests" can justify a seizure based only on reasonable articulable facts. *Id.* at 706, 103 S.Ct. 2637. The Court found that while the detention of a traveler's luggage did not initially, at the precise moment of seizure, violate the Fourth Amendment, the retention of that luggage for over ninety minutes rendered the seizure unreasonable and violated the Fourth Amendment. *See id.* at 710, 103 S.Ct. 2637. Therefore,

---

1. Indeed, the majority sweeps aside, without discussion, two published decisions by district courts in this circuit and two unpublished decisions by our Court that hold or suggest that an individual aggrieved by the government's retention of property after an initial lawful seizure of that property may raise a Fourth Amendment claim. *See Bush v. Banks*, Nos. 95–6370, 96–5015, 1996 WL 668551, at *2 (6th Cir.1996); *Eaton v. Farmer*, No. 93–6305, 1994 WL 151336, at *1 (6th Cir.1994); *Swales v. Township of Ravenna*, 989 F.Supp. 925, 940–41 (N.D.Ohio 1997); *Fox v. Van Oosterum*, 987 F.Supp. 597, 608–09 (W.D.Mich.1997). In their place, the majority cites a single unpublished decision from the Northern District of Illinois, *Palermo v. City of Chicago*, No. 91C4321, 1991 WL

268661, at *3 (N.D.Ill.Dec.4, 1991), in support of its generally unprecedented pronouncement that a seizure that once was reasonable may never subsequently be deemed a seizure and thus cannot violate the Fourth Amendment when it eventually becomes unreasonable.

2. In *Carter*, the Fourth Circuit did not reach the conclusion declared by the majority in the present case. Rather, the court held that the government's retention of personal property seized in a search incident to lawful arrest was reasonable where the government had an interest in the property as evidence in connection with another criminal charge. *See Carter*, 139 F.3d at 426.

while a seizure may technically occur at the moment the government actually takes an item of personal property, the Court has long rejected such a limited view of the term "seizure" under the Fourth Amendment, in favor of the concept that a "seizure" may take place over a period of time. *See id.*

Although it does not directly apply to this case, Rule 41(e) of the Federal Rules of Criminal Procedure, one of a number of criminal procedural rules set forth in a section of the Rules addressed to government searches and seizures, is instructive here. Under Rule 41(e), "a person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court ... for the return of the property on the ground that such person is entitled to lawful possession of the property."[3] Fed.R.Crim.P. 41(e) (1994). As the advisory committee's notes on the provision make clear, Rule 41(e) recognizes the right of a person to obtain the return of lawfully seized property "when aggrieved by the government's possession of it," and not just at the time of initial seizure. Fed.R.Crim.P. 41(e) advisory committee's note. Indeed, the rule reflects that "[l]awful seizure of the property, of itself, may affect the timing of the return, but never the owner's right to eventual return." *United States v. Hubbard,* 650 F.2d 293, 302 (D.C.Cir.1980).

Significantly, the advisory committee's notes to Rule 41(e) urge courts to apply Fourth Amendment reasonableness standards to determine whether a person so aggrieved has a right to the return of his property. Specifically, the committee stated:

> The fourth amendment protects people from unreasonable seizures as well as unreasonable searches, *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and reasonableness under all the circumstances must be the test when a person seeks to obtain the return of property. If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable. But, if the United States' legitimate interests can be satisfied even if the property is returned, continued retention of the property would become unreasonable.

Fed.R.Crim.P. 41(e) advisory committee's note. Thus, the general principle that "seized property, other than contraband, should be returned to the rightful owner after the criminal proceedings have terminated," *United States v. Francis,* 646 F.2d 251, 262 (6th Cir.1981) (Kennedy, J.), invokes the standards of the Fourth Amendment by implementing the type of balancing test set forth in *Place.* Indeed, when asked to decide whether an individual has the right to recover property lawfully seized by the government, courts do not ask as a preliminary matter whether a "continuing seizure" took place, but instead endeavor to identify the "continuing interest" of the government in retaining personal property once its initial interest in the property no longer exists. *See Sovereign News Co. v. United States,* 690 F.2d 569, 577 (6th Cir.1982).

Nevertheless, the majority dismisses Fox's claim by expressing a reluctance to "stretch temporally the Fourth Amendment" to cover the seizure of his property, and denies that a seizure that begins as involuntary but lawful may eventually ripen into one that is unreasonable and thus in violation of the Fourth Amendment. However, *Place* plainly demonstrates that Fourth Amendment jurisprudence already recognizes that a lawful seizure of property might, with the passage of time and the expiration or diminution of government interests, become unlawful. In applying the

---

**3.** While Rule 41(e) permits pretrial motions for the return of seized property, when the owner of the seized property invokes the rule after the close of criminal proceedings against him, courts are to treat his request as a civil action. *See United States v. Duncan,* 918 F.2d 647, 654 (6th Cir.1990).

balancing test of reasonableness that the Court set forth in *Place*, it seems clear that in this case, the nature and quality of the intrusion resulting from the government's retention of Fox's driver's license increased after Fox had served his jail sentence and had his driving privileges restored. In other words, the government's interference with Fox's possessory interests in the license became significant once Fox obtained release from jail and the freedom to use his license as identification and to drive. On the other hand, the government's interest in retaining the license, at the termination of proceedings against Fox and in the absence of any identifiable continuing law enforcement interest, significantly decreased at that point. Indeed, no discernible legitimate government need existed in the retention of Fox's license after he had served his sentence and obtained the restoration of his driving privileges. Still, Hartrum and Van Oosterum arbitrarily withheld the license and interfered with Fox's possessory interest in his own effects, all apparently in violation of the Fourth Amendment.

Curiously, the majority makes explicit that it does not undertake to decide "whether a 'seizure' occurs when a person voluntarily gives a thing to a state actor, then asks the state actor to return that thing, and the state actor refuses to do so." This is not the first time this Court has left open such a possibility. *See United States v. Frazier*, 936 F.2d 262, 265 (6th Cir.1991) (Kennedy, J.). However, the distinctions between such a factual scenario and the one presented here are of limited, if any, importance. Such a case would also involve a lawful deprivation of property by

the government that became unlawful once the government's interest in that property became minimal, as compared with the intrusion on the owner's possessory rights. In any event, the "seizure" in such a case would occur well after the government had completed the act of taking the property away from its rightful owner, and would affirm that the government's possession of private property, even where it did not begin as a seizure, might ripen into a seizure with the passage of time and the onset of unreasonableness.[4]

Moreover, I take issue with the majority's suggestion that because "well-developed procedural due process analysis" applies to this case, this Court should not recognize "a new, uncertain Fourth Amendment analysis that allows litigants to jump straight to federal court every time a state official refuses to return property that was, at least at one point, lawfully seized." In so stating, the majority expresses a willingness, on behalf of this Court, to follow the letter but not the spirit of the rule cautioning against the treatment of one constitutional provision as dominant to another as a mechanism for excluding other constitutional claims. *See Soldal*, 506 U.S. at 70, 113 S.Ct. 538. Indeed, the position of the majority undercuts the notion that two or more constitutional provisions can "target[ ] the same sort of governmental conduct," that "[c]ertain wrongs affect more than a single right, and, accordingly, can implicate more than one of the Constitution's commands," and that the general protection of property set forth in the Due Process Clause does not "bar resort ... to the Fourth Amend-

---

4. Arguably, the giving of consent to seize property requires the government to conform its conduct to the limitations placed upon the right of seizure by the owner. *See Vaughn v. Baldwin*, 950 F.2d 331, 333 (6th Cir.1991). However, this limitation on the government's right to seize exists because consent is an exception to the Fourth Amendment warrant requirement in the same way that an inventory search is, *see Soldal*, 506 U.S. at 64–67, 113 S.Ct. at 545–46, and warrant exceptions

are to be narrowly construed in accordance with the reasons supporting the exception. *See Mincey v. Arizona*, 437 U.S. 385, 393–94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It is wholly consistent with this limitation to say that a seizure lawfully begun pursuant to an exception to the Fourth Amendment may become unlawful once the justifications for the initial seizure terminate.

ment's specific protection for 'houses, papers, and effects.'" *Id.*

If possessory interests protected by the Fourth Amendment are actionable when the government meaningfully interferes with them or when the government's interference with them becomes meaningful, at least some element of a Fourth Amendment seizure exists and this Court cannot refuse to allow a litigant to assert his claim through the vehicle of the Fourth Amendment. *See Bonds v. Cox,* 20 F.3d 697, 702 (6th Cir.1994). While the majority suggests that this view would enable any individual seeking the return of property once lawfully seized to seek damages pursuant to § 1983, only a claimant who could show meaningful interference with his possessory rights and the absence of a continuing governmental interest in the property could make out the constitutional claim described above. A claimant seeking such relief in federal court would also have to show a cognizable and redressable injury of constitutional magnitude to meet traditional jurisdictional prerequisites to suit. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Finally, although the majority suggests such a Fourth Amendment claim would require courts to "assess the reasonableness of refusals or failures to return property," courts have properly assumed this function for many years in their adjudication of Rule 41(e) motions as civil equitable actions for the return of property. *See, e.g., Soviero v. United States,* 967 F.2d 791, 792–93 (2d Cir.1992). Indeed, as discussed above, such actions require courts to determine the reasonableness of the government's continued possession of private property. *See Sovereign News Co.,* 690 F.2d at 577. Courts have even entertained claims for money damages in Rule 41(e) actions where the government has lost the property sought. *See, e.g., Mora v. United States,* 955 F.2d 156, 158 (2d Cir.1992); *United States v. Martinson,* 809 F.2d 1364, 1368 (9th Cir.1987). To require

courts to apply Fourth Amendment reasonableness principles long applied to civil actions under Rule 41(e) for the unreasonable retention of property to civil actions under § 1983 for the same governmental conduct hardly constitutes an invitation to explore a "new, uncertain Fourth Amendment analysis."

The prevailing understanding of seizures under the Fourth Amendment renders impermissible the majority's conclusion that "an initial, lawful seizure followed by a refusal to return that property" cannot violate the Fourth Amendment. Clearly established legal standards illustrate that a seizure does not necessarily begin and end at the moment the government deprives an individual of his personal property. Furthermore, such standards hold unlawful a seizure that extends past legitimate government needs while significantly interfering with one's possessory interest. Indeed, the law may view what was an authorized seizure at some prior point in time as an unreasonable and thus unlawful seizure at some later point in time—if the claimant's possessory interest in that property survives, the government's law enforcement interest in the property ceases, and the government's interference with the claimant's possessory interest is or has become meaningful. Because the majority offers nothing to explain why these well-settled principles of Fourth Amendment jurisprudence do not govern the retention of Fox's license in this case, I respectfully dissent.